# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 797 | **DATE** | 11/25/2003 |
| **CASE TITLE** | Equip for Equality, Inc. vs. Ingalls Memorial Hospital | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 1/8/04 at 10:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order.   Plaintiff's motion for summary judgment [14-1] is granted in part and denied in part. Declaratory judgment is entered against Ingalls and Ingalls is hereby permanently enjoined from denying Equip For Equality, Inc. reasonable access to its inpatient units located at the Wyman Gordon Pavilion. This Court retains jurisdiction to enforce the injunction. The Parties are required to meet and to develop a protocol consistent with this opinion for presentation within thirty-five (35) days.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | **NOV 2** date docketed | |
| | Notified counsel by telephone. | | | **35** |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 11/25/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| DK | courtroom deputy's initials | | DK6 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

EQUIP FOR EQUALITY, INC.,   )
                          )
        Plaintiff,      )    Case No. 03 C 0797
                          )
        v.           )    Magistrate Judge Morton Denlow
                          )
INGALLS MEMORIAL HOSPITAL, )
                          )
        Defendant.     )

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the question of whether and to what extent Plaintiff Equip for Equality, Inc. ("EFE" or "Plaintiff"), is allowed access to Defendant Ingalls Memorial Hospital's ("Ingalls" or "Defendant") inpatient units, which temporarily house persons with mental illnesses, absent either a complaint or probable cause of abuse. EFE has filed a complaint against Ingalls, alleging that Ingalls refused to allow EFE unaccompanied access to the hospital's inpatient facilities, residents, and employees, in violation of both the United States Protection and Advocacy for Individuals with Mental Illness Act ("federal PAIMI Act") and the Illinois Protection and Advocacy for Mentally Ill Persons Act ("Illinois PAMIP Act"). EFE seeks injunctive and declaratory relief and has filed this motion for summary judgment, which raises the issue stated above.

This controversy never should have escalated to this point. The federal and Illinois statutes state with remarkable clarity that an entity empowered with the authority granted to

EFE should be allowed access to a facility such as Ingalls. Although there is some intentional ambiguity in the applicable regulations as a result of the use of the term "reasonable access," this Court is disappointed at the parties' inability to come amicably to a reasonable resolution of the issue. Several sub-issues exist surrounding the meaning of "reasonable access," including whether EFE is entitled to unaccompanied access to both facilities and patients, and whether EFE is entitled to unaccompanied, unannounced access to both facilities and patients. Many of these sub-issues will not be answered definitively by this Court, however, because the parties have not presented an actual case or controversy.

EFE has made a demand for unfettered access, and Ingalls has responded with an absolute denial of access. For the reasons set forth in this opinion, this Court holds: (1) as a matter of law, Ingalls's complete refusal to allow EFE direct physical access to its inpatient units is in violation of both the federal PAIMI Act and the Illinois PAMIP Act; (2) as a matter of law, EFE is entitled to reasonable unaccompanied access to the inpatient units and the outpatient units at Ingalls, as well as to the patients and the programs therein, during, at a minimum, normal working hours and visiting hours; and (3) EFE is not entitled to judgment as a matter of law on the issue of whether it is entitled to unaccompanied and unannounced twenty-four hour access to the inpatient units and the outpatient units at Ingalls, as well as to the patients and the programs therein, absent a complaint or probable cause. The Plaintiff's motion for summary judgment is therefore granted in part and denied in part.

# I. BACKGROUND FACTS

## A. THE PARTIES

Equip for Equality, Inc., is the governor-designated, federally-funded Protection and Advocacy ("P&A") System for persons with mental illnesses in Illinois. Def. Resp. to Pl.'s LR 56.1(b)(3) Stmt. of Facts ¶ 1 [hereinafter "Def. Resp."]. EFE has federal and state authority to enter into facilities that provide care and treatment to persons with mental illnesses. *Id.* Ingalls Memorial Hospital is a private hospital located in Harvey, Illinois, and serves psychiatric patients. Def. LR 56.1(b) Stmt. of Facts ¶ 1 [hereinafter "Def. Facts"]; Def. Answer ¶ 3.

## B. EFE'S REQUESTS FOR ACCESS TO THE FACILITIES AT INGALLS

On at least three occasions, January 11, February 22, and August 6, 2002, EFE attempted to exercise its authority when it made demands for direct physical access to the psychiatric ward at Ingalls. Def. Resp. ¶¶ 2, 4, 6. EFE desired unaccompanied access to the facilities and the patients in the psychiatric ward at Ingalls in order to inform and educate the staff and the patients of its services and to tour the facilities.[1] Pl.'s Mot. Summ. J., Ex. A [hereinafter Pl.'s Mot.]. The Department of Psychiatry Manager, who was acting at the direction of Ingalls, initially denied EFE's demands because she believed that EFE lacked legal authority under section 5/2-114 of the Illinois Mental Health Code. Pl.'s Mot., Ex. H,

---

[1] The Court notes that the impetus for EFE's requests may have been a Human Rights Authority investigation into an alleged restraint violation. *See* Pl.'s Mot., Ex. H, at 63-69. Regardless, EFE did not express that it desired access in order to exercise its investigative function.

3

at 55-56, 72-75. Specifically, Ingalls's position was that EFE could not access its facilities unless it met any one of three conditions: (1) it obtained a court order; (2) it was conducting an investigation; or (3) it received a complaint from a patient. *Id.* at 38. Ingalls, however, permitted EFE representatives to view the outpatient units of the psychiatric ward on September 13, 2002, but refused to grant EFE access to the inpatient units. Def. Facts ¶ 5; Def. Resp. ¶¶ 7, 13. Ingalls made a distinction between the outpatient units and the inpatient units based on confidentiality and privacy concerns. Pl.'s Mot., Ex. H, at 20-21. Ingalls continues to deny EFE access to the inpatient units of the psychiatric ward at the hospital. Def. Resp. ¶ 16.

## C.    THE INPATIENT AND OUTPATIENT UNITS

Within the psychiatric ward at the Wyman-Gordan Pavilion of Ingalls, there are two inpatient units and several outpatient units. *Id.* ¶ 8, 9. The outpatient units are unlocked. *Id.* ¶ 12. The inpatient units, however, are locked, and a key is required to gain access to the units, which are located on the second floor of the pavilion. *Id.* ¶¶ 10, 11.

The inpatient units are locked at all times and are located on the second floor because those units are reserved for patients who may be schizophrenic, severely depressed, suicidal, homicidal, manic, extremely paranoid, delusionary, combative, or violent. Def. Facts ¶¶ 7, 8. The inpatient units are divided into three program groups, which include the general psychiatric unit with a capacity for twenty patients and the geriatric unit with a capacity for fourteen patients over the age of fifty-five. *Id.* ¶ 7. These patients receive intensive daily

4

therapy, with a duration of five to ten days. *Id.* ¶ 9. This intensive daily therapy, referred to as Milieu Therapy, is a highly structured, twenty-four hours per day treatment, requiring a safe, therapeutic environment and continuous care. *Id.* The methods of therapy include group psychotherapy, reminiscing therapy, social skill development, gender group therapy, medication education, disease education, and relaxation therapy. *Id.*

The intensive nature of the therapy and the volatile mental state of the patients in the inpatient units require a minimum amount of visiting hours, which Ingalls strictly observes. *Id.* ¶ 10. Normal visiting hours are no longer than one or two hours, depending on the type of patient, and holiday visiting hours are five-and-a-half hours long; both normal and holiday visiting hours are at set times. *Id.* ¶¶ 11-12. Visitors are permitted outside those set times only upon admission or an attending physician's order. *Id.* ¶ 13. Patients must give permission to visitors to enter the inpatient unit, but a treating physician may deny that permission if receiving visitors may be detrimental to a patient's continued recovery. *Id.* ¶ 10. No patient may receive more than two visitors at once. *Id.* Strict observation of these restrictions is crucial to the success of the inpatients' treatments because of the brevity and intensity of the treatment plans and the sensitivity of the patients. *Id.* ¶¶ 14-15.

Those severely mentally ill patients that require inpatient treatments are extremely distrustful of everyone, necessitating an environment where patients feel secure. *Id.* ¶ 15. Losing a sense of security may result in a patient becoming unresponsive to therapy or violent toward others. *Id.* ¶ 16. Additionally, even the more stable patients desire privacy

5

with regard to their treatment for mental illness, fearing the stigma of being considered mentally ill. *Id.* ¶ 17.

## D. INGALLS'S POLICY FOR VISITS BY LAW ENFORCEMENT AND REGULATORY AGENCIES

Because the presence of strangers in the inpatient unit is inevitable, Ingalls has attempted to protect its patients' privacy by instituting procedures to be followed when a law enforcement officer requires entry into the facility. *Id.* ¶ 19. When a law enforcement officer arrives, the patient area is notified by telephone first, and the Clinical Supervisor or the Director is immediately notified second. Def. Resp. to Mot., Ex. 5. If the patient whom the officer seeks to interview cannot be interviewed in the main lobby, then the officer is escorted to the patient's room. *Id.* Ingalls considers it vital that professional staff facilitate or intervene when a patient interacts with an officer. *Id.*; Def. Facts ¶ 19.

In addition to visits by police officers, Ingalls is frequented by other monitoring agencies, such as the Illinois Guardianship and Advocacy Commission, the Illinois Department of Public Health, the Joint Commission on Accreditation of Health Organizations, and the Center for Medicare and Medicaid Services. Def. Facts ¶¶ 23-25. None of these agencies visit Ingalls unaccompanied, unannounced, or outside regular business hours. *Id.*

EFE now demands "unaccompanied access to the facilities, residents and employees at Ingalls Hospital without advanced notice and at any reasonable time during and after business hours." Compl. at 7.

6

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 682-83 (7th Cir. 2000). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Sinkler*, 209 F.3d at 683; *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998).

The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A fragment of evidence in support of the non-movant's position is insufficient to successfully oppose a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). This burden must be met by

7

appropriate citations to relevant evidence and cannot be met with conclusory statements or speculation. *Brasic v. Heinenmann's Inc.*, 121 F.3d 281, 286 (7th Cir. 1997). Weighing evidence, deciding credibility, and inferring reasonable deductions are responsibilities for a jury and not for a judge to decide in making a summary judgment determination. *Anderson*, 477 U.S. at 255.

## III. JURISDICTION

This Court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1331 because this action does arise under the federal PAIMI Act. Plaintiff alleges that Defendant is in violation of the act by prohibiting Plaintiff from accessing Defendant's facilities, patients, and employees. Furthermore, Plaintiff has standing in this case because it seeks to establish that Defendant's actions are causing injury to the P&A System itself. *Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999) (citing *Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492 (11th Cir. 1996)).

## IV. DISCUSSION

This case presents the following issues: (1) whether EFE's access to the inpatient unit at Ingalls requires it to have a court order, to be part of an investigation, or to be in response to a patient complaint; (2) whether allowing EFE unaccompanied and unannounced twenty-four hour access into the inpatient facilities at Ingalls constitutes "reasonable access" under the federal and state statutes that govern P&A systems, where EFE neither has received a patient complaint nor has probable cause that abuse has occurred; and (3) what constitutes

8

"reasonable access." EFE argues that it has the authority to gain unaccompanied and unannounced access to the facilities, residents, and employees of Ingalls at any reasonable time during and after business hours. Compl. at 7. Ingalls now recognizes EFE's right to access its inpatient facilities, but argues that "reasonable access" means that the access must be in the least intrusive manner possible. Def. Resp. to Pl.'s Mot. for Summ. J. at 11 [hereinafter Def. Resp. to Mot.]. The proper resolution of this issue begins with an exploration of the source and purpose of EFE's authority.

## A.    STATUTORY AND REGULATORY BACKGROUND

### 1. The Purpose of the P&A System

The P&A system is a creation of three federal statutes: the Protection and Advocacy for Developmental Disabilities Act, 42 U.S.C. § 15043, the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et seq.*, and the Protection and Advocacy for Individual Rights Act, 29 U.S.C. § 794e, *et seq.* Additionally, Congress enacted the Developmental Disabilities Assistance and Bill of Rights ("DDABR") Act, 42 U.S.C. § 6000, *et seq.*, to protect the human and civil rights of those with developmental disabilities because inhumane and despicable conditions had been discovered at New York's Willowbrook State School for persons with developmental disabilities. *Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 494 (11th Cir. 1996); *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F. Supp. 2d 1039, 1045 (E.D. Wis. 2001). Similar concerns were the impetus for the enactment of the federal PAIMI Act

of 1986, wherein Congress recognized that "individuals with mental illness are vulnerable to abuse and serious injury." 42 U.S.C. § 10801(a)(1); *Czaplewski*, 131 F. Supp. 2d at 1045. The purpose of the federal PAIMI Act is "to ensure that the rights of individuals with mental illness are protected" and "to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes . . . ." 42 U.S.C. § 10801(b)(1), (2)(A).

## 2. Access Authority Granted by the Federal and State Statutes

The federal PAIMI Act gives "[a] system established in a State . . . to protect and advocate the rights of individuals with mental illness . . . the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." *Id.* § 10805(a)(1)(B). Pursuant to the federal PAIMI Act, a P&A system is "independent of any agency in the State which provides treatment or services (other than advocacy services) to individuals with mental illness" and shall "*have access to facilities in the State providing care or treatment.*" *Id.* § 10805(a)(2), (3) (emphasis added). "Access" is not defined in the statute.

Congress supplemented the authority granted to a P&A system by the federal PAIMI Act when it enacted the Protection and Advocacy of Individual Rights ("PAIR") Act in 1992. 29 U.S.C. § 794e, which authorizes P&A systems to serve those persons with disabilities who

10

are ineligible for services under pre-existing P&A legislation, including the federal PAIMI Act. *Doe v. Stincer*, 175 F.3d 879, 883 (11th Cir. 1999).

Pursuant to these acts, a state cannot receive federal funds for services to persons with disabilities or mental illnesses unless it has established a P&A system. *See, e.g.*, 42 U.S.C. § 10803. Given this federal mandate, the State of Illinois enacted the Protection and Advocacy for Mentally Ill Persons Act of 1987. 405 ILCS 45/1, *et seq.* The Illinois PAMIP Act empowered the Governor of Illinois to "designate an agency to administer the protection and advocacy system for mentally ill persons, pursuant to the federal [PAIMI Act]." *Id.* § 45/1. The Illinois PAMIP Act granted to the P&A system

> access to all mental health facilities . . . providing care or treatment to mentally
> ill persons. Such access shall be granted for the purposes of meeting with
> residents and staff, informing them of services available from the agency,
> distributing written information about the agency and the rights of persons who
> are mentally ill, conducting scheduled and unscheduled visits, and performing
> other activities designed to protect the rights of mentally ill persons.

*Id.* § 45/3. Pursuant to these provisions, Protection and Advocacy, Inc., a not-for-profit corporation, was granted the authority to protect and advocate on behalf of the mentally ill residing in Illinois. *Protection & Advocacy, Inc. v. Murphy*, No. 90 C 569, 1992 WL 59100, at *1, 9-10 (N.D. Ill. Mar. 16, 1992). EFE has succeeded Protection and Advocacy, Inc., in this role.

### 3. Access Authority Granted by the United States Code of Federal Regulations

The authority of any P&A system, including EFE, is also governed by Chapter I of Title 42 of the Code of Federal Regulations ("CFR"), adopted by the Department of Health

and Human Services. A P&A system has three primary functions: to investigate, to educate, and to monitor. *See Iowa Protection & Advocay Services, Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F. Supp. 2d 1150, 1169 (N.D. Iowa 2001).

### a. Access Authority for Investigatory Purposes

In order to investigate incidents of abuse or neglect when a P&A either receives a complaint or has probable cause to believe that such incidents have occurred, the CFR grants a P&A system the authority to have "reasonable unaccompanied access" to residents and employees of a facility. 42 C.F.R. § 51.42(b)(1)-(2). The scope of access granted to a P&A system for the purpose of executing its investigative function has been interpreted as being broad. *See, e.g., Gerard Treatment Programs, L.L.C.*, 152 F. Supp. 2d at 1159 (noting that a P&A system determines when probable cause exists, and access cannot be denied because a facility disagrees with the determination); *J.S. Tarwater Developmental Ctr.*, 97 F.3d at 497 (noting the "broad remedial framework" of the federal PAIMI Act). This issue is not involved in this case because EFE does not seek access based on a complaint or because it has probable cause.

More specifically, not at issue in this case are instances where a P&A system requests access as a result of an investigation, a reported incident, a complaint, the existence of probable cause of abuse, or the existence of imminent danger of serious abuse or neglect. This Court recognizes that a P&A system has broad access to patients and facilities under those circumstances, but it is not necessary to decide the limits of that access, if any.

12

Additionally, access to records is not at issue in this case. Access to records is governed by 42 C.F.R. § 51.41, and the issue of access to records is not currently before the court.

### b. Access Authority for Non-Investigatory Purposes

The focus of this case is to what extent a P&A system should be permitted access to a facility that treats mentally ill persons and the patients therein when circumstances that trigger an investigation are not present. The scope of access granted to a P&A system for the purpose of executing its educational and monitoring functions is governed by the statutes and the regulations.

A P&A system is charged with educating patients and caretakers about the rights and needs of individuals with mental illnesses. *See* 42 C.F.R. § 51.42(c)(1). The system also must monitor compliance with respect to patients' rights and safety. *Id.* § 51.42(c)(3). Although a P&A system is entitled to the full panoply of access, the extent of that access under each one of these circumstances must be reasonable. *Id.* § 51.42(c).

Title 42 of the CFR grants a P&A system the following access to facilities and residents:

> (a) *Access to facilities and residents* shall be extended to all authorized agents of a P&A system.
>
> (b) A P&A system shall have *reasonable unaccompanied access* to public and private facilities and programs in the State which render [sic] care or treatment for individuals with mental illness, and to all areas of the facility which are used by residents or are accessible to residents. . . .
>
> . . .

13

(c) In addition to access as prescribed in paragraph (b) of this section, a P&A system shall have *reasonable unaccompanied access* to facilities including all areas which are used by residents, are accessible to residents, and to programs and their residents at *reasonable times, which at a minimum shall include normal working hours and visiting hours. . . . P&A activities shall be conducted so as to minimize interference with facility programs, respect residents' privacy interests*, and honor a resident's request to terminate an interview. This access is for the purpose of:

(1) Providing information and training on, and referral to programs addressing the needs of individuals with mental illness, and information and training about individual rights and the protection and advocacy services available from the P&A system, including the name, address, and telephone number of the P&A system.

(2) Monitoring compliance with respect to the rights and safety of residents; and

(3) Inspecting, viewing and photographing all areas of the facility which are used by residents or are accessible to residents.

(d) *Unaccompanied access to residents* shall include the opportunity to meet and communicate privately with individuals regularly, both formally and informally, by telephone, mail and in person. Residents include minors or adults who have legal guardians or conservators.

(e) The right of access specified in paragraph (c) of this section shall apply despite the existence of any State or local laws or regulations which restrict informal access to minors and adults with legal guardians or conservators. The system shall make every effort to ensure that the parents of minors or guardians of individuals in the care of a facility are informed that the system will be monitoring activities at the facility and may in the course of such monitoring have access to the minor or adult with a legal guardian.

42 C.F.R. § 51.42(a)-(e) (emphasis added). The CFR also restricts EFF by requiring that it keep information confidential:

(a) Records maintained by the P&A system are the property of the P&A system which must protect them from loss, damage, tampering or use by unauthorized individuals. The P&A system must:

(1) Except as provided elsewhere in this section, *keep confidential all records and information,* including information contained in any automated electronic database pertaining to:

(i) Clients *to the same extent as is required under Federal or State laws for a provider of mental health services;*

(2) Have written policies governing access to, storage of, duplication and release of information from client records . . . .

42 C.F.R. § 51.45(a)(1)-(2) (emphasis added). Therefore, a P&A system never should be prohibited from accessing a facility because of concerns about patient privacy.

## B. ACCESS, GENERALLY

Although neither the statute nor the regulations define "access," the statutory and regulatory language clearly and unambiguously gives a P&A system the authority to access the facilities and the residents of a hospital. A P&A system is granted access to the facilities and the residents of a hospital under § 10805(a)(3) of the PAIMI Act, § 45/3(B) of the Illinois PAMIP Act, and 42 CFR § 51.42(a). These sections do not qualify the term "access." This omission by the bodies that promulgated the statutes and regulations is telling: A facility, such as Ingalls, cannot deny a P&A system, such as EFE, access to its facilities and residents, especially when that access is accompanied access.

The regulations set forth the minimum requirements for access and mandate that unaccompanied access be reasonable. Pursuant to the regulations, EFE has the right of reasonable access to Ingalls's facilities at reasonable times when EFE seeks to monitor compliance regarding patients' rights and safety, to inspect, view, and photograph a facility's

patient areas, and to educate or inform staff and patients of its services. Unaccompanied

access, at a minimum, must include normal working and visiting hours. At oral argument,

Ingalls appears to now accept these basic precepts. The issue in this case, therefore, becomes

whether the scope of the access requested by EFE is "reasonable access" at "reasonable

times."

## C.   CASE LAW INTERPRETATION OF "REASONABLE ACCESS" AT "REASONABLE TIMES"

Although Ingalls refused to permit EFE access to its inpatient units because it believed

EFE lacked legal authority to enter, Ingalls now raises practical concerns as its objections to

EFE's demand for unannounced and unaccompanied access to the inpatient units at Ingalls.

These practical concerns are important and must be balanced against EFE's right of access

in order to determine what is "reasonable access," even though Ingalls's initial reasons

completely lacked legal foundation and this Court finds that Ingalls has backpedaled into its

current objections to granting EFE full access. Indeed, the term "unaccompanied access" is

modified by the term "reasonable" in the regulations, and the regulations require EFE's

activities to minimize interference with the programs at Ingalls and to respect the patients'

privacy interests. 42 C.F.R. § 51.42(c). Because there are no cases in this Circuit to assist

this Court's decision as to what constitutes "reasonable access" to patients, programs, and

facilities, this Court must look for guidance to the few other districts that have addressed this

issue. Generally, those courts have found restrictions on access to patients to be more

reasonable than restrictions on access to facilities.

In *Robbins v. Budke*, 739 F. Supp. 1479 (D.N.M. 1990), the court balanced a P&A's right to access a medical center with the effect of that access upon the patients' care and therapeutic treatment, and it found that a hospital cannot require advance notice and accompanied tours of its facilities. In *Robbins*, the Protection and Advocacy System of New Mexico ("NMP&A") requested a permanent injunction against the Las Vegas Medical Center ("LVMC") after LVMC refused to permit NMP&A unlimited twenty-four hour access to its facilities and patients. *Id.* at 1480-82. To protect its autonomy and its patients' privacy, LVMC required NMP&A to either receive its written authorization or have a complaint before accessing its patients or facilities; it required NMP&A to identify a patient by name and show authorization before meeting that patient; and it required patients to sign request forms before speaking with NMP&A. *Id.* at 1482, 1484, 1486. LVMC further limited NMP&A's access to its patients by requiring "reasonable advanced notice," restricting access to certain patients for "good cause," and allowing visits only during regular business hours with LVMC staff present in a location determined by LVMC. *Id.* at 1482.

The court in *Robbins* found that the policies and practices of LVMC violated NMP&A's statutory right of access and thwarted the purpose of the federal PAIMI Act because they negatively affected NMP&A's daily communications with the patients. *Id.* at 1485, 1487. The court reasoned that mentally ill patients are unable to recognize a violation of their rights, unwilling to complain to a LVMC staff member, unwilling to initiate contact with a complete stranger, and incapable of understanding that a P&A system is their resource

17

or that they have access to a P&A's address or phone number. *Id.* at 1487. A P&A system must be allowed to informally educate all mentally ill patients and should be permitted to informally discuss issues with patients and answer patients' questions. *Id.*

Although the mentally ill warrant special consideration, the court found that unlimited twenty-four hour access to LVMC was unnecessary to accomplish the purpose of the federal PAIMI Act. *Id.* (citing *Doe v. Gallinot*, 657 F.2d 1017, 1022-23 n.7 (9th Cir. 1981), for the proposition that the mentally ill warrant special consideration). Additionally, the court found that twenty-four hour notice to speak with a patient is reasonable, absent the absolute necessity for a sooner meeting. *Id.* On the other hand, LVMC's requirement that tours of the facility be announced and accompanied "seriously hindered" NMP&A's ability to even observe the facilities. *Id.*

Finally, the court found that LVMC had not shown that NMP&A's unlimited access was harmful to the patients and that LVMC's concern for the patients' privacy was unwarranted because the federal PAIMI Act requires a P&A system to maintain the confidentiality of patients' records to the same extent as required by the care provider. *Id.* at 1488. As a result, the court ordered LVMC to permit NMP&A to "visit any building, residential unit or facility during regular business hours for informal visits with clients or for observation or monitoring purposes." *Id.* at 1489.

Similarly, in *Michigan Protection & Advocacy Service, Inc. v. Miller*, 849 F. Supp. 1202, 1204, 1209 (W.D. Mich. 1994), the court granted summary judgment in favor of a

18

P&A system after examining the federal statutes "in conjunction with the practical factors affecting access" to facilities for mentally ill minors. In *Miller*, the Michigan Protection and Advocacy Service, Inc. ("MPAS"), claimed that the Michigan Department of Social Services ("DSS") violated the federal PAIMI Act by failing to provide reasonable access to its facilities. *Id.* at 1204. To protect visitor's safety, to avoid disrupting educational and rehabilitative programs, and to protect patients' privacy, DSS permitted access only if a minor was a MPAS client or if MPAS had received a complaint regarding a minor. *Id.* MPAS demanded greater access but did not specify to what extent it sought access.

After thoroughly examining the authority granted to MPAS under the federal statutes, the court considered the practical concerns affecting access to the DSS facilities. *Id.* at 1206-08. The court found that the policy denying MPAS full access defeated the purpose of the federal PAIMI Act. *Id.* at 1207. Nonetheless, the court looked for evidence of "substantial interference" with DSS programs, potential violations of patients' privacy rights, and threats to visitor's safety, stating that DSS's "practical concerns are important and must be considered in shaping the parameters of access to DSS facilities." *Id.* at 1208.

The court, however, found no evidence that the access requested by MPAS would "substantially interfere" with DSS programs. *Id.* Implying that twenty-four hour access could "substantially interfere" with the programs, the court noted that MPAS was willing to schedule interviews with DSS residents in order to minimize interference with the patients' educational and rehabilitative programs. *Id.* Finally, the court found no evidence that greater

access by MPAS would threaten the safety of visitors to DSS facilities. *Id.* Although noting that some restrictions were warranted to ensure visitors' safety, the court concluded that the current limitations on access were not the only methods to ensure safety. *Id.* Consequently, the court granted summary judgment in favor of MPAS, but it refused to decide the appropriate level of access to which MPAS was entitled under the federal acts and referred the matter to two Special Masters. *Id.* at 1209-10 (citing Fed. R. Civ. P. 53).

Consistent with the decisions in *Robbins* and *Miller*, in *Pennsylvania Protection & Advocacy, Inc. v. Royer-Greaves School for the Blind*, No. 98-3995, 1999 U.S. Dist. LEXIS 4609, at *35-36 (E.D. Pa. Mar. 24, 1999), the court granted summary judgment in favor of a P&A system to the extent that it may have unannounced access to facilities and granted summary judgment in favor of the defendant school to the extent that advance notice for access to patients was reasonable. In *Royer-Greaves*, Pennsylvania Protection & Advocacy, Inc. ("PP&A"), because of a suspicion of systemic neglect based upon several complaints and deficient reports, made one scheduled and one unscheduled visit to the facilities at the Royer-Greaves School for the Blind ("RG"), a non-profit entity that provided special education to multi-handicapped, mentally challenged blind students. *Id.* at *4-5. PP&A attempted two more unannounced site visits, requesting access to residents, facilities, and records, but RG refused these requests and insisted that PP&A first make an appointment. *Id.* *7. PP&A sued under the DDABR Act, which uses the same language as the federal PAIMI Act to grant P&A systems the authority to access facilities, seeking "unlimited access

to RG during working and visiting hours without prior notice or appointment." *Id.* at *7-8, *10-11. The court held that requiring PP&A to make an appointment twenty-four hours in advance of meeting with individual students was an appropriate restriction and that granting PP&A unannounced access to RG's facilities was reasonable. *Id.* at *35.

With regard to residents of a facility, the court acknowledged that a P&A system clearly has the right to "unaccompanied access to all residents of a facility at reasonable times, which at a minimum shall include normal working hours and visiting hours," but found that restrictions on access that avoid disruption of a patient's routine "inherently seem more reasonable than general access to a facility where there is reason to believe abuse or neglect is ongoing." *Id.* at *17. The court concluded that, given the students' disability and their important daily routine, it was reasonable for PP&A to make an appointment before seeing residents. *Id.* at *18. On the other hand, with regard to the facilities, the court concluded that requiring advanced notice of site visits was unreasonable because doing so would seriously hinder PP&A's ability to monitor the conditions to which the patients were subject. *Id.* at *18. Thus, PP&A could tour the facilities without prior notice. *Id.*

## V. APPLICATION TO THE CASE AT BAR

EFE is entitled to access to the patients and the facilities at Ingalls for the purpose of performing its monitoring and educating functions, despite the lack of a court order, an investigation, or a complaint. The purposes of both the federal PAIMI Act and the Illinois PAMIP Act were thwarted in this case when Ingalls refused to grant EFE any access

whatsoever to the inpatient units. Such inaction clearly violates both acts. EFE does not need a complaint or probable cause to enter into a facility or to talk to patients; its services include education and referral, as well as legal representation. The inaction of Ingalls in this case has reduced the authority of EFE to such a degree that it can offer the inpatients at Ingalls only a fraction of the services to which they are entitled under the acts. *Cf. Miss. Protection & Advocacy Sys., Inc. v. Cotten*, 929 F.2d 1054, 1059 (5th Cir. 1991). Regardless, an appropriate balance must be met in this case, and this court finds that such a balance is reached more easily if distinctions are made between the right of access to facilities versus the right of access to patients, as well as between the right of access for monitoring purposes versus the right of access for educating purposes. Given these distinctions, the parties should be able to create their own protocol to reach the correct balance between EFE's right of access and Ingalls's concern for its patients' well-being.

## A.    RIGHT OF ACCESS TO FACILITIES VERSUS RIGHT OF ACCESS TO PATIENTS

It is appropriate to require more strict requirements for access to individual patients than to the facilities themselves. *See Cotton*, 929 F.2d at 1057, 1059 (affirming time and place restrictions on access as a means to minimize interference with programs); *Royer-Greaves*, 1999 U.S. Dist. LEXIS 4609, at *18 (finding that "reasonable access includes general facility access without notice, and patient access with twenty-four hour notice"). For example, unaccompanied and unannounced access to facilities is reasonable, but such access does not necessarily constitute reasonable access to patients. Moreover, twenty-four hour

access to facilities may be reasonable under strict conditions, but twenty-four hour access to patients generally is not reasonable.

Requiring some amount of notice and accompanied access to specific patients may be reasonable, and it is here that medical judgment plays its greatest role. The courts in *Robbins*, *Miller*, and *Royer-Greaves* appropriately balanced the practical concerns of the caretakers with the right to access of a P&A system because the practical concerns of the medical professionals who care for the patients a P&A system seeks to interview must be weighed in order to minimize interference with patients' treatment programs, to respect patients' privacy interests, and to provide security for everyone involved.

Moreover, there is no requirement in the regulations that patient visits be unannounced, and even though the Illinois PAMIP Act permits "unscheduled visits" it does not specifically state that those visits include meetings with patients. Furthermore, there is no specific regulation that either permits or prohibits a P&A system to photograph patients

In this case, EFE should be allowed unannounced and unaccompanied access to the inpatient units at Ingalls only where such visits will not substantially interfere with the treatment of the patients, who are extremely unstable, sometimes volatile, sensitive to the slightest change in their environment, and subject to intensive, highly structured, continuous care for days at a time. Ingalls's practical concerns, unlike those of the *Miller* defendant, are supported by its stringent pre-existing policies regarding police and visitor contact with the patients. Thus, EFE ordinarily should not seek unannounced and unaccompanied twenty-

four hour access to the inpatients at Ingalls, unless such access becomes necessary to accomplish its functions of monitoring or educating.

## B. RIGHT OF ACCESS FOR MONITORING PURPOSES VERSUS RIGHT OF ACCESS FOR EDUCATING PURPOSES

A P&A system must be given the leeway to discover problems or potential problems at a facility and to raise its level of scrutiny to that of an investigator if necessary. Indeed, this Court shares many of the same concern as the *Robbins* court, especially that requiring tours of a facility to be announced and accompanied would seriously hinder a P&A system's ability to monitor the facility for compliance with the rights and safety of the patients and would thwart the purpose of the federal and state acts.

What is reasonable for the purpose of monitoring, however, may not be reasonable for the purpose of educating. In determining what is reasonable access for the function being exercised by a P&A system, the purpose of that function and its effect on the patients and their programs must strike an appropriate balance. For example, when a P&A system is exercising its monitoring function, it is reasonable for it to be more intrusive and invasive than when it is exercising its educational function. There is no absolute necessity for a P&A system to arrive unannounced in order to educate the patients and the staff on the patients' needs and rights. It is reasonable, therefore, to permit more limited access for the purpose of educating than for the purpose of monitoring, although a P&A system, at a minimum, always must have unaccompanied access at reasonable times during normal working hours

and visiting hours to patients, programs, and facilities and all areas therein that are used by or accessible to residents.

## 1. Monitoring

When a P&A system is exercising its monitoring function, reasonable access includes unannounced access. When exercising this function, a P&A system may inspect, view, and photograph those areas to which it has access. Photographing patients under strict guidelines seems reasonable if a P&A system were exercising its monitoring function.

## 2. Educating

When a P&A system is exercising its educating function, reasonable access does not include unannounced access. Giving prior notice before accessing facilities and exercising this function is reasonable.

Under the state statute, a P&A system should be permitted to meet with a facility's staff and to make its literature available, either by posting it at designated areas or by placing it in conspicuous locations for patients to collect at their will. A P&A system also should be permitted unaccompanied access to patients and programs in order to educate patients of their rights and needs and to refer them to the services provided by the P&A system. Private meetings with patients are important to the success of the P&A system because it gives patients the opportunity to be candid about their experiences at the facility.

Although the educating function of a P&A system is an extremely important function, it is the function with the least amount of urgency and requires the least amount of surprise

to be effective. Therefore, when exercising this function, deference should be given to the caretakers' medical judgments and security concerns.

## C.     THE PARTIES' DEVELOPMENT OF PROTOCOL

The difficulty in this case is determining the specific scope of access to which EFE is entitled, given Ingalls's concern that EFE's unaccompanied presence in the inpatient unit would be detrimental to the quality of care received by the patients at the hospital and would violate the patient's privacy rights under Illinois law. *See* Def. Facts ¶¶ 3, 5. To that end, this Court takes very favorable notice of the actions taken by the district court in *Mississippi Protection & Advocacy System, Inc. v. Cotten*, No. J87-0503(L), 1989 U.S. Dist. LEXIS 17075 (S.D. Miss. Aug. 4, 1989).

In *Cotten*, the district court found the defendants' visitation policy to have violated the Developmental Disabilities Act by imposing a litany of unreasonable restrictions upon a P&A system's right to access its facilities and patients. *Id.* at *31. As a result, the district court entered the following order:

> Defendants shall submit within thirty days a proposed order outlining a revised policy for [plaintiff's] access to [the facility]. Such policy should provide for regular and frequent opportunities for [plaintiff] to visit [the facility] and speak with residents in private on an informal basis. While it is not required that [plaintiff] have access to all parts of the facility at all times, provision must be made for reasonable and frequent access to all residents. Only in this way can [plaintiff] provide [the facility's] residents with meaningful information about their rights and the services available to them. The policy should also provide that if an incident of abuse and neglect is reported to [plaintiff] or if [plaintiff] has probable cause to believe it has occurred, [plaintiff] will have reasonable and prompt access to the . . . facility and to all potential witnesses of the abuse or neglect.

*Id.* at *34. When the defendants failed to comply with the order, the district court entered a permanent injunction that relieved the plaintiff of most of the restriction imposed by the defendants. *Miss. Protection & Advocacy System, Inc. v. Cotten*, 929 F.2d 1054, 1057 (5th Cir. 1991).

This Court likewise orders EFE and Ingalls to meet and prepare a protocol with respect to situations in which EFE requests access but lacks a court order, a complaint, or an investigation. Furthermore, this Court strongly encourages EFE to develop a standard protocol that will govern to what extent it will request initial access to a facility and to distribute the protocol to facilities within Illinois. In the end, the parties in this case have the same interests in mind – the best interests of the patients – and should work together to serve those common interests. Those common interests are best served by adhering to the principles as set forth in this opinion.

## VI. CONCLUSION

For the foregoing reasons, this Court holds **that as a matter of law, Ingalls's complete refusal to allow EFE to access its inpatient units is in violation of both the federal PAIMI Act and the Illinois PAMIP Act. As a matter of law, EFE is entitled to reasonable unaccompanied access to the inpatient units and the outpatient units at Ingalls, as well as the patients and programs therein, during, at a minimum, normal working hours and visiting hours. EFE is not entitled to judgment as a matter of law on the issue of whether it is entitled to unaccompanied and unannounced twenty-four**

27

hour access to the inpatient units and the outpatient units at Ingalls, as well as the patients and programs therein, absent a complaint or probable cause. The Plaintiff's motion for summary judgment is therefore granted in part and denied in part. The parties are required to meet and to develop a protocol consistent with this opinion for presentation within thirty-five (35) days. Declaratory judgment, therefore, is entered against Ingalls, and Ingalls is hereby permanently enjoined from denying EFE reasonable access to its inpatient units located at the Wyman Gordon Pavilion as set forth in this opinion. This Court retains jurisdiction to enforce the injunction.

SO ORDERED THIS 25th DAY OF NOVEMBER, 2003.

_Morton Denlow_

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Byron L. Mason
EQUIP FOR EQUALITY, INC.
11 East Adams Street
Suite 1200
Chicago, IL 60603

Counsel for Plaintiff

David J. Rowland
Alison B. Willard
SEYFARTH SHAW
55 East Monroe Street
Suite 4200
Chicago, IL 60603-5803

Counsel for Defendant

# United States District Court
## Northern District of Illinois
### Eastern Division

Equip for Equality, Inc.                         **JUDGMENT IN A CIVIL CASE**

       v.                                   Case Number: 03 C 797

Ingalls Memorial Hospital

- ☐   Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

- ■   Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's motion for summary judgment is granted in part and denied in part. Declaratory judgment is entered against Ingalls and Ingalls is hereby permanently enjoined from denying Equip For Equality, Inc. reasonable access to its inpatient units located at the Wyman Gordon Pavilion.

Michael W. Dobbins, Clerk of Court

Date: 11/25/2003

Donna Kuempel, Deputy Clerk